Sammie **RICHARDSON**, Jr., Defendant
Below, Appellant,

v.

**STATE of Delaware**, Plaintiff
Below, Appellee.

No. 7, 1995.

Supreme Court of Delaware.

Submitted: Dec. 5, 1995.
Decided: Feb. 22, 1996.

Karl Haller, Assistant Public Defender, Georgetown, for Appellant.

Timothy G. Willard (argued), and Gary A. Myers, Deputy Attorneys General, George-town, for Appellee.

Before VEASEY, C.J., HOLLAND and BERGER, JJ.

VEASEY, Chief Justice:

Defendant below-appellant, Sammie Richardson, Jr. ("Richardson"), appeals from sentences based on convictions in Superior Court after a jury trial on charges of second degree robbery, second degree kidnapping, first degree assault and resisting arrest. He raises two issues in this appeal. First, he argues that the Superior Court erred when it allowed the jury to consider two alternative means to find that Richardson possessed the purpose to commit kidnapping in the second degree. Second, he argues that the victim's pre-trial identification of him was unreliable because it was overly suggestive, and therefore the Superior Court erred in allowing the jury to hear testimony of such pre-trial identification.

We hold that under Superior Court Criminal Rule 7(c)(1), the State may allege within a single count of an indictment that the defendant committed second degree kidnapping by one or more specified means. We also hold that the pre-trial identification of Richardson was sufficiently reliable and did not create a substantial likelihood of misidentification. Accordingly, we affirm the judgment of the Superior Court.

## I. FACTS

At approximately 10:45 p.m., Iris Ludwig ("Ludwig" or "victim"), was using a pay-phone located in the parking lot of a convenience store and gas station. The phone booth had a light inside and the parking lot was illuminated by a fluorescent Citgo sign. Ludwig noticed a man, later identified by her as Richardson, sitting on a railing under the Citgo sign located about one and one-half feet from the phone booth. After she exited the phone booth and began walking to her car, Richardson walked toward her mumbling. Ludwig entered the driver's side of her car and attempted to close the door, but Richardson grabbed the door and pulled it open. He pushed Ludwig to the passenger seat and jumped behind the wheel of the car. Ludwig's two-year old son was confined in a child-safety seat in the back seat of the car. Ludwig begged Richardson to let her and her son go, but he ignored her pleas and put the car in reverse. Ludwig jumped out of the car and attempted to remove her son but Richardson pulled away with the two-year old still in the back seat.

Ludwig immediately notified the police and described the perpetrator as a black male, around five feet, six inches, to five feet, eight inches, weighing between 180 to 200 pounds, and wearing a red hooded sweatshirt and a green trench coat. Shortly thereafter, the police discovered the abandoned car with the toddler unharmed in the back seat. Based on the description given by Ludwig, the police suspected that Richardson was the perpetrator and arrested him at his residence. Richardson claimed that he was asleep in a friend's truck at the time of the carjacking.

About an hour and fifteen minutes after the carjacking, Ludwig arrived at the police station to identify the man the police had in custody. She was instructed by a police officer to stay outside the police station and look into the police station through a window to identify a person they had in custody. The police officer instructed her that if there was any doubt in her mind to say she was not sure; conversely, if there was no doubt to tell them she was positive. No police officer remained outside with the victim. She stood outside with her mother, brother and her husband as Richardson was positioned near the window. The room was illuminated. Richardson was handcuffed and was standing next to an uniformed police officer. He was wearing clothing that exactly matched Ludwig's earlier description. When Ludwig saw Richardson through the window she immediately responded, "It's him. It's him."

## II. CHARGING ALTERNATIVE OR MULTIPLE MEANS

The first question before this Court involves the proper application of Superior Court Criminal Rule 7(c)(1) to an indictment alleging a violation of 11 *Del.C.* § 783. Stat-

utory interpretation involves a purely legal determination. *Hercules Inc. v. Leu Trust & Banking (Bahamas) Ltd.*, Del.Supr., 611 A.2d 476, 481 (1992), *cert. dismissed*, 507 U.S. 1025, 113 S.Ct. 1836, 123 L.Ed.2d 463. Accordingly, "[t]he appropriate standard of appellate review requires this Court to determine 'whether the Superior Court erred as a matter of law in formulating or applying legal principles.'" *Moses v. Board of Educ. of New Castle County Vocational Technical School Dist.*, Del.Supr., 602 A.2d 61, 63 (1991) (quoting *Delaware Alcoholic Beverage Wholesalers, Inc. v. Ayers*, Del.Supr., 504 A.2d 1077, 1081 (1986)).

■ Prior to trial, the defense objected to the kidnapping charge in the indictment because it contained two alternative means to find that Richardson possessed the purpose to commit kidnapping in the second degree. The indictment charged that Richardson kidnapped the two-year old for two purposes: (1) to facilitate the commission of robbery; and (2) to take the child from his parent. The Superior Court found that the indictment was proper and charged the jurors that they could convict Richardson of Kidnapping Second Degree if they unanimously found that he possessed either of two purposes. The jury instruction read in pertinent part:

> The restraint was either (a) for the purpose of facilitating the commission of a felony, Robbery in the Second Degree or flight thereafter; *or* (b) for the purpose of taking him from the custody of his parent. As to this element, the State has alleged alternative elements (a) or (b) as aforestated. To find this element, all twelve jurors must unanimously find either (a) or (b).

The second degree kidnapping statute reads:

> A person is guilty of kidnapping in the second degree when he unlawfully restrains another person with any of the following purposes: ... (3) To facilitate the commission of any felony or flight thereafter; or ... (6) To take or entice any child less than 16 years of age from the custody of his parent, guardian or lawful custodian; and the actor voluntarily

releases the victim alive, unharmed and in a safe place prior to trial.

11 *Del.C.* § 783(3), (6). Richardson asserts that the structure of the statute requires the State to choose only one purpose under which to proceed. Contrary to this assertion, Superior Court Criminal Rule 7(c)(1) allows the inclusion of multiple means in one count. The rule reads in pertinent part, "[the indictment may allege] in a single count that the means by which the defendant committed the offense are unknown or that the defendant committed it by one or more specified means." Del.Super.Ct.Crim.R. 7(c)(1). This Court addressed the meaning and the purpose of this provision in *Demonia v. State*, Del.Supr., 210 A.2d 303 (1965). We stated that the rule "was designed to abolish any necessity of utilizing multiple counts in order to charge the commission of the offense by different or several means, in those cases where the means must be alleged as a material element of the crime." *Id.* at 305.

■ The listing of multiple means of committing a statutory offense is a recognized and accepted practice. *Griffin v. United States*, 502 U.S. 46, 112 S.Ct. 466, 116 L.Ed.2d 371 (1991). In analyzing the practice, the United States Supreme Court noted:

> A statute often makes punishable the doing of one thing *or* another, ... sometimes thus specifying a considerable number of things.... [T]he indictment on such a statute may allege, in a single count, that the defendant did as many of the forbidden things as the pleader chooses, employing the conjunction *and* where the statute has "or," and it will not be double, and it will be established at the trial by proof of any one of them.

*Id.* at 51, 112 S.Ct. at 470 (quoting 1 J. Bishop, New Criminal Procedure § 436, pp. 355–56 (2d ed. 1913). The Supreme Court accepted this practice one hundred years ago in *Crain v. United States*, 162 U.S. 625, 16 S.Ct. 952, 40 L.Ed. 1097 (1896) (holding that the accused may be found guilty upon proof that he did any one of the things constituting a crime under a statute and that listing multiple means is appropriate). In two recent cases, the Supreme Court affirmed that alternative means could be set forth in one

count of an indictment. *See Griffin,* 502 U.S. 46, 112 S.Ct. 466; *Schad v. Arizona,* 501 U.S. 624, 111 S.Ct. 2491, 115 L.Ed.2d 555 (1991). It was a historical practice and continues to remain a common practice to list in one count of an indictment alternative means with respect to an element of a crime.

In the case *sub judice,* the indictment alleged, and the jury was permitted to find, that Richardson committed second degree kidnapping with either of two purposes. Arguably, Richardson committed second degree kidnapping by several means, or with multiple purposes. He facilitated the commission of a felony, second degree robbery, by stealing the car, and he took the two-year old from the custody of his mother. The State properly included multiple means in one count instead of placing each mean or purpose in a separate count. This practice is acceptable under Rule 7(c)(1) and this Court's explanation of the rule in *Demonia.* While listing two possible means to satisfy an element of the offense presents a risk of less than a unanimous jury finding on that specific element, *see, e.g., In re Winship,* 397 U.S. 358, 364, 90 S.Ct. 1068, 1073, 25 L.Ed.2d 368 (1970) (due process requires "proof beyond a reasonable doubt of every fact necessary to constitute the crime with which [the defendant] is charged"), the Superior Court, by properly instructing the jury, ensured that the jury would reach an unanimous decision on the *mens rea. See Probst v. State,* Del. Supr., 547 A.2d 114, 121 (1988).

## III. PRE-TRIAL IDENTIFICATION

The second issue presented for decision involves the validity of the identification. At the pre-trial suppression hearing, Richardson argued that the identification made pursuant to the show-up should be suppressed since it was unduly suggestive. The Superior Court acknowledged that the show-up identification method employed by the police raised concerns. The court found, however, that under the totality of the circumstances, the show-up was not unduly suggestive and the identification was sufficiently reliable.

 *This Court reviews the Superior Court's denial of a motion to suppress evidence on a factual basis pursuant to an abuse* of discretion standard. *Hicks v. State,* Del. Supr., 631 A.2d 6, 8 (1993); *Gregory v. State,* Del.Supr., 616 A.2d 1198, 1200 (1992). When the admissibility of an out-of-court identification is challenged under the Due Process Clause as unduly suggestive, the test applied by courts provides that:

> An identification procedure will not pass constitutional muster where it is "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." That a confrontation is suggestive, without more, however, cannot amount to a due process violation; the unnecessarily suggestive identification procedure must also carry with it the increased danger of an irreparable misidentification. In other words, if the Court determines under the totality of the circumstances that a line-up is impermissibly suggestive, but nonetheless reliable, evidence of the confrontation will not be excluded at trial.

*Younger v. State,* Del.Supr., 496 A.2d 546, 550 (1985) (citations omitted). The trial court must determine whether: (1) the confrontation was unnecessarily suggestive; and (2) there existed a likelihood of misidentification. *Harris v. State,* Del.Supr., 350 A.2d 768, 770 (1975).

 As the Superior Court noted, Richardson's identification from the show-up contained suggestive elements. Ludwig was told prior to the identification that the police had a man in custody and they needed her to identify him. She was surrounded by relatives when making the identification and was not supervised by a police officer. Additionally, when she identified Richardson, he was handcuffed and standing next to an uniformed police officer. The entire scenario, from the time the crime was committed to the time of identification, occurred in about one hour and fifteen minutes. The question of suggestiveness is invariably fact-driven. Based on facts of the case, however, the show-up procedure was not *impermissibly* suggestive and the Superior Court did not commit reversible error.

Although these elements present a danger of misidentification, show-up identifications are necessary to the proper functioning of

the criminal justice system. *See Neil v. Biggers,* 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972); *Stovall v. Denno,* 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967); *Harris,* 350 A.2d at 770–71 (stating that "immediate ... confrontation between the victim and suspect is essential both to law enforcement and to fairness toward innocent suspects alike."); *Watson v. State,* Del.Supr., 349 A.2d 738 (1975) (finding that a show-up identification was an immediate product of the offense and the defendant's apprehension and was therefore both necessary and permissible).

In *Watson,* this Court upheld the conviction of the defendant where the victim identified the person who robbed her within thirty minutes of the robbery. *Watson,* 349 A.2d at 739. The victim was seated in the back seat of the police car and the suspect was brought to the car to allow the victim to look at him. *Id.* Similarly, Richardson was apprehended shortly after the commission of the crime and was almost immediately presented to the victim for identification.

Under *Watson,* the pre-trial identification of Richardson was not impermissibly suggestive to Ludwig. She viewed him approximately one hour and fifteen minutes after the carjacking. The confrontation occurred shortly after the offense while Ludwig's memory was fresh and while Richardson was in the clothing that she stated he wore when he committed the offense.

Even assuming *arguendo* that the identification was impermissibly suggestive, under the totality of the circumstances there was not a substantial likelihood of misidentification. The factors the United States Supreme Court has set forth when considering the reliability of an identification include:

> the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of [the witness'] prior description of the criminal, the level of certainty demonstrated [by the witness] at the confrontation, and the length of time between the crime and the confrontation.

*Manson v. Brathwaite,* 432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140 (1977). The record supports the Superior Court's finding that the identification was sufficiently reliable. The victim testified that she had a clear opportunity not only to confront, but also to stare at, the individual. She saw Richardson while she was on the phone, looked at him when she was walking to her car and stared at him when she was pleading for her and her child's freedom. It was nighttime, but the parking lot was lit by a fluorescent sign, the phone booth was lit, and the inside car light was on when the door was open. Ludwig's description of Richardson matched his clothing, height and weight. Finally, at the show-up, she identified Richardson with certainty and did not hesitate or exhibit doubt.

Following the criteria enunciated in *Manson,* the Superior Court correctly found that the pre-trial identification was sufficiently reliable and there was not a substantial likelihood of misidentification. Under the facts of this case, Richardson's constitutional rights were protected under both prongs of *Harris.* The show-up was not unnecessarily suggestive, nor did there exist a substantial likelihood of misidentification. Accordingly, this assertion of error must be rejected.

## V. CONCLUSION

The judgment of the Superior Court is **AFFIRMED.**